UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

| | | |
|---|---|---|
| JEFFREY M. THOMPSON | ) | |
| | ) | |
| V. | ) | NO. 2:12-CV-18 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |

## REPORT AND RECOMMENDATION

This matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation. This is an action for judicial review of the administrative denial of the plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act. The plaintiff has filed a Motion for Judgment on the Pleadings [Doc. 12] and the defendant Commissioner has filed a Motion for Summary Judgment [Doc. 14].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues

differently, the Commissioner's decision must stand if supported by substantial evidence. *Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff was 37 years of age at the time he alleged his disability began on March 4, 2010. He has a high school education. He has past relevant work experience as a quality control inspector, a stocker, and as a cell phone technician. The Administrative Law Judge ["ALJ"] found that plaintiff could not return to any of his past relevant work due to the nature of his mental impairment.

The plaintiff's medical history is summarized by the defendant as follows:

> Prior to his amended alleged onset date of March 4, 2010, Plaintiff received treatment from Eric Moffet, M.D., a psychiatrist, beginning in August or September 2005 (Tr. 153-96). Dr. Moffet's written notes are largely illegible, but he apparently diagnosed Plaintiff with depression, panic disorder, and post-traumatic stress disorder (Tr. 158, 161, 163-78, 180, 182-84, 186, 188, 190-95). Regarding Plaintiff's mental status, Dr. Moffet generally noted Plaintiff had a normal appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment, with occasional notations of a blunted affect, anxiousness, or depression (Tr. 161, 163-78, 180, 182-84, 186, 188, 190-95). Dr. Moffet saw Plaintiff every month to three months and prescribed medication (Tr. 153-58, 161, 163-96). In April 2008, nearly two years before Plaintiff's amended alleged onset date, Dr. Moffet noted Plaintiff had applied for disability, had not worked since July 2007, and his prognosis was poor (Tr. 204). In January 2009, more than a year before Plaintiff's amended alleged onset date, Dr. Moffet opined that Plaintiff's ability to perform various work-related activities was "markedly limited" or "extremely limited" (Tr. 198-203). On February 15, 2010, less than a month before Plaintiff's amended alleged onset date, Dr. Moffet opined that Plaintiff was "unable to return to work" until February 20, 2010 (Tr. 197).
> On March 2, 2010, two days before Plaintiff's amended alleged onset date, Dr. Moffet indicated his mental status examination revealed Plaintiff had a normal

2

appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, and linear thought process (Tr. 158). Dr. Moffet's notes suggest he indicated Plaintiff had flight of ideas, but given Dr. Moffet's notation that Plaintiff's thought process was linear, he likely meant to indicate Plaintiff had normal judgment, as he did in prior and subsequent notes (Tr. 158; see, e.g., Tr. 161, 223). Regarding treatment, Dr. Moffet apparently prescribed medication and advised Plaintiff to return in three months (Tr. 158).

On May 11, 2010, Jenaan Khaleeli, Psy.D., a State agency psychological consultant, evaluated the evidence and assessed Plaintiff's mental condition using a psychiatric review technique form and mental residual functional capacity (RFC) form (Tr. 205-22). Dr. Khaleeli noted Plaintiff had major depressive disorder and panic disorder (Tr. 205, 208, 210, 217). Regarding Plaintiff's mental RFC, Dr. Khaleeli concluded Plaintiff could understand and remember simple and one to three step detailed tasks; could concentrate and persist for at least a two-hour period in an eight-hour day with customary breaks; could not interact appropriately with the public, but could interact appropriately with co-workers and supervisors occasionally during a workday; and could adapt to infrequent change (Tr. 221).

On May 27, 2010, Dr. Moffet noted Plaintiff had a normal appearance, appropriate affect, euthymic mood, intact sensorium, intact memory, unremarkable thought content, linear thought process, and normal judgment, and he advised Plaintiff to return in three months (Tr. 223). Dr. Moffet noted Plaintiff was anxious and depressed on August 20, 2010, but his other mental status findings remained unchanged (Tr. 236). When Plaintiff returned on October 20, 2010, Dr. Moffet noted Plaintiff had a blunted affect and was depressed, but he did not indicate Plaintiff was anxious and his other mental status findings were unchanged (Tr. 235). Dr. Moffet noted Plaintiff had a blunted affect on December 18, 2010, but he did not indicate Plaintiff was anxious or depressed and his other mental status findings remained the same (Tr. 234). In his last clinical record from before the ALJ's decision, Dr. Moffet indicated on February 10, 2011, that Plaintiff was anxious, but his other mental status findings were unremarkable (Tr. 233). Dr. Moffet records indicate he prescribed medication for Plaintiff, but he apparently did not recommend any other treatment (Tr. 223, 231-40).

On February 28, 2011, Dr. Moffet completed a "Mental Assessment of Ability to do Work-Related Activities (Mental)," apparently at the request of Plaintiff's attorney (Tr. 226, 228-30). Dr. Moffet opined Plaintiff had no useful ability to do almost all work-related activities (Tr. 228-29). In a March 2, 2011, letter to Plaintiff's attorney, Dr. Moffet stated his assessment reflected his opinion that Plaintiff "could not handle the mental rigors of sustained work activity" (Tr. 226). Dr. Moffet stated Plaintiff's normal or near normal mental status exams were due to his medication and controlled environment, but claimed Plaintiff's mental state would be "radically different" if Plaintiff worked and he would quickly deteriorate even in minimally stressful situations (Tr. 226-27).

[Doc. 15, pgs. 2-4].

In the administrative hearing, the ALJ took the testimony of Robert S. Spangler, a vocational expert. The ALJ asked Dr. Spangler if there would be jobs for the plaintiff at various exertional levels if he were "limited to simple routine, repetitive work, better with things than people."[1] The VE identified millions of jobs in the national economy. (Tr. 32).

In his hearing decision, the ALJ found that the plaintiff had severe impairments of depression, panic disorder and post-traumatic stress disorder, although he also found that the plaintiff did not meet or equal any listed impairment. (Tr. 13).

The ALJ discussed the plaintiff's mental impairments. He agreed with Dr. Jenaan Khaleeli, the state agency psychologist (Tr. 205-18), and found "that the claimant suffers from a mild restriction in activities of daily living, moderate difficulties in social functional, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation which have been of extended duration." He found that the plaintiff had the residual functional capacity ["RFC"] "to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to performing simple, repetitive, routine work and is better dealing with things rather than people." (Tr. 14).

He then discussed the evidence from Dr. Moffet, plaintiff's treating psychiatrist. He noted that Dr. Moffet's records reflect that the plaintiff had responded favorably to the medication and counseling provided by Dr. Moffet. The ALJ stated that plaintiff's Global Assessment Functioning ["GAF"] "is always rated in the 50's, which is indicative of no more than moderate mental limitations." He then noted that Dr. Moffet had opined that the

---

[1] There is no claim, at least in this review, of a physical impairment.

plaintiff could not work, but that Dr. Moffet's notes reflected that all of plaintiff's exams "have been normal and that the plaintiff is considered stable." The ALJ recounted Dr. Moffet's observation that plaintiff's environment must be controlled "so that stress is avoided," and indicated that this was incorporated into the ALJ's RFC finding. He pointed out the plaintiff's activities of daily living. Based upon all of this, he found that "little weight is given to Dr. Moffet's opinion that the claimant could not perform any work." (Tr. 15).

The ALJ found that, due to his mental impairments, the plaintiff could not return to his past relevant work as a quality control inspector, stocker or cell phone technician. However, based upon the testimony of the VE, he found that there were substantial jobs which exist in the national economy which a person with plaintiff's RFC could perform. Accordingly, he was found to be "not disabled." (Tr. 16-17).

Plaintiff first points to a letter sent to his counsel from Dr. Moffet on July 12, 2011, one month after the ALJ rendered his hearing decision. Dr. Moffet points out that the GAF scores noted in his office records were not "in the 50's" as the hearing decision states, but were 50. He opined that a GAF of 50 was indicative of "serious symptoms or any serious impairment in social and occupational functioning (unable to keep a job)." Dr. Moffet concluded by stating that "[t]his accurately describes Mr. Thompson's serious limitations which have persisted during the time frame you questioned me about. There is no way this patient could have engaged in any substantial gainful activity, even low stress jobs which do not involve dealing with people." He attached a copy of the "Multi-Axial Assessment GAF scale" to the letter. That document says that a GAF of 51 to 60 is indicative of "moderate" symptoms as opined by the ALJ in reliance on a GAF being "in the 50's," but states that a

5

GAF of 41 to 50 indicates serious symptoms as pointed out, and opined, by Dr. Moffet. (Tr. 241-42).

The Court completely understands that this letter was not before the ALJ, and is not evidence which was before the Commissioner. Likewise, Dr. Moffet's opinions on "substantial gainful activity" are legal adjudicative findings to be made by the Commissioner. However, the letter does point out a serious flaw in what is already a borderline case, which is that the ALJ misunderstood or misread the GAF scores in Dr. Moffet's treatment records, and based his opinion of RFC in no small part on that misconception. As far as the Court can tell, Dr. Moffet's GAF scores are the ***only*** GAF scores in the entire record. While an argument can certainly be made that the attachment to Dr. Moffet's letter is some unknown source opining on the interpretation of what a GAF score means, it is certainly no less true that the ALJ relied on some unknown source for his finding that a GAF score "in the 50's...is indicative of no more than moderate mental limitations."(Tr. 15). Also, Dr. Moffet is a treating psychiatrist who opined himself as to what the GAF scores meant. That opinion from a treating physician must mean more than the opinion of the ALJ or this Court for that matter.

The Court however does not believe that plaintiff has established disability so overwhelmingly as to require a judicial order of benefits. Dr. Moffet's opinion is entitled to great respect, but the ALJ's opinion has support from the state agency psychologist's report and plaintiff's activities of daily living. Also, with the same apparent symptoms and level of severity, the plaintiff continued to work for some time after the onset of his mental illness. To be candid, this Court is not prepared to say that there are not jobs which this plaintiff

6

could perform. In this somewhat unusual circumstance, the Court believes that the case should be remanded for a mental evaluation by an examining source, including a GAF assessment.

It is therefore respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be GRANTED IN PART, and that the case be remanded as outlined above. It is further recommended that the defendant Commissioner's Motion for Summary Judgment [Doc. 14] be DENIED.[2]

Respectfully submitted,

  s/ Dennis H. Inman
United States Magistrate Judge

---

[2] Any objections to this report and recommendation must be filed within fourteen (14) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).